Kesterson Lumber Corporation v. Commissioner.
Kesterson Lumber Corp. v. Commissioner
Docket No. 127.
United States Tax Court
1944 Tax Ct. Memo LEXIS 260; 3 T.C.M. (CCH) 432; T.C.M. (RIA) 44153; May 9, 1944
*260 Carl E. Davidson, Esq., 1525 Yeon Bldg., Portland, Ore., for the petitioner. Earl C. Crouter, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: The present proceeding involves the redetermination of deficiencies for the calendar year 1937 of $8,583.47 in income tax together with a penalty of $4,291.74, and of $1,478.31 in excess profits tax together with a penalty of $739.15. The first question presented is whether the Commissioner erred in disallowing deductions from petitioner's gross income in the amount of $28,500, claimed to have been expenses incurred by petitioner during the taxable year in the nature of reasonable allowance for salaries or other compensation for personal services actually rendered. If the answer to this question is in the negative, one further question is presented, namely, whether the Commissioner erred in adding to the deficiencies determined a penalty for fraud, pursuant to section 293 of the Revenue Act of 1936. If, however, the answer to the first question is in the affirmative, two additional questions are presented, namely (a) whether the salary or other compensation paid to two of petitioner's principal employees *261 was reasonable; and (b) whether section 301 of the Revenue Act of 1937, which amended section 24 (a) of the Revenue Act of 1936, operates to prevent the deduction of the whole or any part of the $28,500, which petitioner claims is deductible from its gross income, under section 23 (a) of the Revenue Act of 1936. We make the following: Findings of Fact Petitioner is a corporation which was duly organized under the laws of the State of Oregon on May 26, 1933. Its principal office is located at Klamath Falls, Oregon. Its corporation income and excess profits tax return for the calendar year 1937 was received by the collector of internal revenue for the district of Oregon on March 15, 1938. The authorized capital stock of petitioner as of December 31, 1937, was 2,000 shares of no par value common stock and 750 shares of no par value preferred stock. Irving E. Kesterson (hereinafter sometimes referred to as Irving), petitioner's vice president and general manager, owned 1,100 shares of common stock and 289.5 shares of preferred stock. William I. Kesterson (hereinafter sometimes referred to as William), petitioner's treasurer and superintendent of operations, owned 739 shares of common *262 stock and 268 shares of preferred stock. A. P. Heup, petitioner's secretary, owned 160 shares of common stock and 12.5 shares of preferred stock. G. H. Kesterson, petitioner's president, owned one share of common stock. Only the common stock had voting privileges. These four individuals comprised petitioner's board of directors. The remaining shares of preferred stock had been issued and were owned by various individuals Petitioner kept its books of account and filed its return for 1937 on an accrual basis. Petitioner is engaged in the manufacture and sale of lumber in Klamath County, Oregon, in the vicinity of the City of Klamath Falls. From 1933 to and including 1937, petitioner leased its sawmill on a year-to-year basis from the Washington and Great Northern Townsite Co. Negotiations for a longer lease were conducted on behalf of petitioner by Irving and petitioner's attorney, John B. Ebinger, with a vice president of the lessor. These negotiations took place in Seattle, Washington, on or about December 17, 1937 and resulted in an agreement being reached between the parties to a five-year lease. A formal lease, dated December 30, 1937, was signed by Irving E. Kesterson for petitioner *263 on January 18, 1938, and by the lessor on February 21, 1938. The salaries of Irving E. Kesterson and William I. Kesterson for the years 1926 to 1936 inclusive, were as follows: Irving E.
William I.
Kesterson
Kesterson
1926
$18,000
$11,000
1927
13,500
6,500
1928
16,000
7,500
1929
22,500
7,500
1930
22,500
7,500
1931
None
None
1932
None
None
1933
2,400
1,200
1934
4,400
3,600
1935
10,500
3,600
1936
15,000
12,500
The operations of petitioner during 1937 were profitable. Its net income for 1937 was $36,901.56 as shown on its return. During the summer of 1937 the two Kesterson brothers discussed the proposition of granting certain employees and associates of the petitioner "an interest in the business in order to compensate for services being rendered." In connection with the bonus question for 1937, there was from the start some idea or thought of issuing stock to the employees. For a year or a year and a half there had been inquiry from the key men as to whether it was possible to get an interest in the company. In September or October of 1937, petitioner's managing officer, Irving E. Kesterson, discussed with Rodolph, who had been accoutant and *264 tax consultant for the company for several years, the matter of "bonuses and any stock that might be issued to employees whether it was deductible or not." Rodolph told him that it must be definitely determined before the end of the year if it was to be deductible. Kesterson "inferred" that he wanted to develop some plan whereby the company could issue stock to the employees, and discussed the advantages of having employees take an interest in the business and have some feeling that they were a part of the organization. During the fall of 1937 the profit-sharing plan was formulated and "the individuals to whom a bonus in the form of stock decided upon the amount agreed upon." Final action was delayed until December 24, 1937, when a special meeting of the stockholders was held "and the bonus list approved," as Irving E. Kesterson later expressed it in a protest sworn to by Irving E. Kesterson and filed May 3, 1941, with the internal revenue agent. Material portions of such protest are set forth in the margin. [1]
*265 The board of directors of petitioner on December 21, 1937, authorized the following salaries for 1937; Irving E. Kesterson, $18,000., William I. Kesterson, $9,000; and A. P. Heup, $7,500. The by-laws of the petitioner provide that the board of directors shall have power to fix the compensation of officers and employees and to conduct, manage, and control the affairs and business of the corporation. Irving E. Kesterson was of the opinion that "The bonus question was a stockholder matter, and was in a subsequent meeting." There was a "Directors' meeting for one purpose, and a stockholders' meeting for another purpose," as he expressed the matter. On or about December 17, 1937, Irving requested petitioner's attorney, Ebinger, to prepare the minutes of a meeting of the stockholders of petitioner to be held on December 24, 1937. Ebinger prepared such minutes sometime between December 20, 1937, and December 23, 1937. This draft stated that A. P. Heup was present at the meeting held on December 24, 1937, and that he seconded the resolution offered by William to pay the bonuses. A special meeting of petitioner's stockholders was held at the office of the corporation in Klamath Falls, Oregon, *266 on December 24, 1937. Irving and William were the only stockholders present. Heup was notified of this meeting in advance and of the contemplated action, but refused to attend because of his opposition to the proposed plan (not because of attending to taxpayer's distributions in California, as recited in the protest above). G. H. Kesterson, who is the father of Irving and William, was not present at the meeting, though the minutes recite his presence. His position as president of petitioner was honorary and he rarely, if ever, attended meetings. No directors' meeting was called for December 24, and no notice given of a directors' meeting to be held on that date. The following record was made and resolutions were unanimously adopted at the meeting of December 24, 1937: "RESOLUTION "WHEREAS, it is the desire of the stockholders of the Kesterson Lumber Corporation, to reward certain of its employees holding responsible positions in its organization, in the form of a gratuity above the salary earned by such employees, for faithful and loyal services rendered during the year, 1937, and to promote further loyalty and cooperation on the part of such employees: "THEREFORE BE IT RESOLVED, *267 that Kesterson Lumber Corporation pay to the employees hereinafter named, a bonus in the amount set opposite their names respectively, for the calendar year 1937." I. E. Kesterson
$3,000.00
W. I. Kesterson
3,000.00
A. P. Heup
2,500.00
A. N. Beals
2,500.00
B. G. Thompson
2,000.00
R. P. Rodolph
2,000.00
J. B. Ebinger
2,000.00
R. V. Chase
2,000.00
B. A. Purcell
1,500.00
F. C. Ranker
1,500.00
J. C. Hillhouse
1,250.00
W. A. Shannon
1,000.00
D. W. Cater
1,000.00
B. J. Vaughn
750.00
E. J. Hamilton
750.00
L. C. Proebestel
750.00
H. G. Harder
1,000.00
Said resolution being put to vote, was unanimously adopted. Thereupon Irving E. Kesterson offered the following resolution which was seconded by W. I. Kesterson: "RESOLUTION "WHEREAS, a number of the employees of Kesterson Lumber Corporation holding responsible positions with said organization, have from time to time expressed a desire to acquire some of the capital stock of said corporation; and, "WHEREAS, the stockholders of Kesterson Lumber Corporation are appreciative of the interest of such employees in the organization and value of the services heretofore rendered to it by them, and are desirous of promoting *268 the interest, loyalty and cooperation of such employees in and to the corporation and its business; "THEREFORE BE IT RESOLVED, by the stockholders of Kesterson Lumber Corporation that the capital common stock of said corporation be increased from two thousand (2,000) shares to twenty-five hundred (2,500) shares." Said resolution being thereupon put to a vote was unanimously adopted. * * * * *
Within a few days after the meeting of December 24, 1937, and before January 1, 1938, Heup was advised of what had taken place at that meeting. He received from Irving a copy of the original draft of the minutes of the December 24 meeting. He retained this copy in his possession and did not sign it. On December 27, or 28, 1937, Irving advised Ebinger of Heup's absence from the December 24 meeting. Ebinger thereupon in Irving's office made the necessary changes in the original draft of the minutes of the December 24 meeting to reflect Hup's absence and a second and final draft was prepared. Irving, William, and G. H. Kesterson signed the final draft of the minutes of the December 24 meeting on or before December 31, 1937. Heup did not sign them until May 1939. On Christmas Eve the employees *269 were given cash bonuses of from $35 to $150, but were not told about the bonuses here in question. About December 27, 1937, another meeting was held in petitioner's office at Klamath Falls. There were present the two Kesterson brothers, and all others to whom bonuses had been voted, except Rodolph and Heup. Irving Kesterson presided. He mentioned the stockholders' meeting of December 24, discussed the bonus, and stated that it had been decided to make stock available to key men in order to give them "an opportunity to acquire an actual interest in the corporation." There was handed to each man, except the two Kestersons and Ebinger, a slip of paper bearing only the figures showing the amount of his bonus. The men unanimously expressed a desire to become stockholders. Nothing was said as to restrictions upon stock which might be issued. No agreement was made, in writing or otherwise, between the petitioner and the key men that they would during 1937 receive a bonus in cash, or that they would be credited therewith. No payment of the bonus was made by cash or stock during 1937. The matter of bonus was not passed upon by any directors' meeting, formally or informally. Heup having ignored *270 a request to enter the bonuses on the books, petitioner's bookkeeper was, prior to the end of the year, instructed by Irving Kesterson to record the bonuses in the company's books, and an attorney was on the same evening of the second meeting, instructed to file application for an increase of petitioner's capital stock. The amount of the bonuses were entered in the corporation's books, in the journal voucher and accounts payable ledger sometime after January 1, 1938, and prior to February 1938, the amount of the bonuses then being credited as of December 31, 1937, to the individual accounts of those involved. Rodolph received no notice of the bonus to him or to the others until sometime after March 4, 1938, and was surprised to learn of it; and the record does not show any notice during 1937 to the key men of credits to their accounts. The petitioner's books had for years never been closed and final closing entries were never made until after approval by Rodolph's firm of accountants. Questions were often discussed with them before the closing. The books for 1937 were closed about February 1938. The petitioner filed summary information returns, which were required by Title VIII *271 of the Social Security Act to be filed by February 1, 1938, for the last six months of 1937. Such returns did not reflect the payment of the bonuses in 1937. Amended returns so indicating were filed later in 1938. Rodolph, in his own income tax return for 1937, verified by him on March 4, 1938, did not include the $2,000 bonus to him. He did include it in an amended return filed August 1, 1938. He directed the preparation of the petitioner's income tax return for 1937, which was filed by him on March 15, 1938, and which, in accounts payable reflects the bonuses to the key men (and in accounts receivable, the bonuses to the two Kestersons and Heup, who were indebted to the corporation). Rodolph inquired whether the bonus had been decided on before the end of the year 1937, by responsible officers or directors and was sure that it had been and that "was good enough for me," as he phrased it. His consideration was whether the action had been decided upon and definitely determined before the end of the year. He also directed the preparation of the returns of the two Kesterson brothers for 1937, which included the bonuses to them. The date of the filing thereof is not indicated by the *272 record. Of the other recipients of bonus, the record contains information as to filing of income tax returns only as to Chase, Purcell, Cater and Hamilton. Chase filed his return on March 11, 1938, before consulting with Rodolph, and did not include the bonus as income, but included it in an amendment filed in 1939. Purcell's return was filed March 1, 1938, not showing the bonus as income, but he included it in an amended return filed April 1, 1938, after a discussion with Rodolph on March 22, 1938. Purcell's amended return was accompanied by a letter dated March 28, 1938, in which he made the following statement: "Please find here enclosed a supplementary tax return for an additional income which was unknown at the time that the original income tax return was filed." The returns of Cater and Hmilton were filed on March 15, 1938, and included the bonus as income. Rodolph advised Cater and Hamilton to include the bonus. Prior to March 14, petitioner's attorney discussed with the Corporation Commissioner the proposition of issuance of nonvoting stock, but it was not favored, so the attorney suggested issuance of common stock to be voted by a voting trust. On March 14, the Corporation *273 Commissioner of Oregon issued its order increasing petitioner's capital stock by 500 shares of no par value common stock. On March 22, 1938, there was another meeting of officers and key men. At that meeting there were executed by the officers and key men a "Buy and Sell" agreement, and a voting trust, which are by reference incorporated in full in these findings of fact. In short, and in pertinent part, the two instruments provided that stock to be issued to the key men should be subject to a voting trust, for the life of trustees; that stock issued should be restricted as to sale, and that the trustees should first have a 30-day option, for the benefit of any of the key men wishing to buy, and thereafter the corporation should have a 30-day option, in both instances the purchase price to be 50 per cent of the purchase price paid by the seller; that then only could the stock be sold to any outsider, and then subject to a 30-day option in favor of trustees, and of the corporation, in case of any subsequent offer of sale of the stock; that anyone leaving petitioner's employ, and the estate of any key man, was required to sell on the above terms. (Some sales were later made under these *274 provisions.) The voting trust could be terminated by a two-thirds vote, but only by written consent of the trustees, and in event of termination, the secretary of the corporation would act in place of the trustees in the purchase of stock. The stock was irrevocably assigned to the trustees. The Kesterson brothers were appointed trustees. Annual dividends were paid on petitioner's stock as follows: In 1937, 1938 and 1939, 10 per cent; and in 1940 and 1941, 12 per cent. On May 23, 1938, petitioner secured a permit to sell 500 shares of its stock for cash at $100 per share. The application contained a balance sheet of petitioner as of December 31, 1937, starting with cash of $47,675.51 and showing accounts payable to be $42,029.22, and, in capital and surplus, unissued stock, subscribed and paid, $28,500. About June 10, 1938, another meeting was held, at which checks, to the parties, and in the amounts named in the resolution of December 24, 1937, were distributed to and endorsed in blank by the parties to whom made (except one check endorsed to petitioner's order), after which each man received a stock certificate, which was assigned to him to the voting trust, he receiving a voting *275 trust certificate. All of the checks were dated June 1, 1938, were endorsed by petitioner and are stamped as paid on June 20, 1938, with the exception of one, which is stamped paid on June 21, 1938. Heup, the secretary, was not present at any of the meetings. His check also dated June 1, 1938, was sent to him and is endorsed "For deposit" and is marked paid August 8, 1938. Heup's cashing of his check caused Irving E. Kesterson to "hit the roof." He told Heup that the bonus was not being given in that form and that Heup would have to return it, or it would be charged against him. Irving's salary for 1937, including the so-called cash bonus, was $21,000 During 1937 he was general manager and chief executive of petitioner.. He was responsible for the conduct of the corporation's affairs, including finances, general operating policies, sales policies, and the selection of key employees. He had been connected with the lumber industry in that section since 1913. He was a director in the Western Pine Association, which had a membership of 130 operators, and president of the National Wooden Box Association for two terms. In 1937 and 1938, he was offered $40,000 per annum and $35,000 per *276 annum, respectively, by two lumber companies of the same general size as petitioner, to perform the same duties he performed in 1937 for petitioner. Compensation in the amount of $21,000 to Irving for the services rendered by him to petitioner during 1937 would be reasonable in amount. William's salary for 1937, including the so-called cash bonus, was $12,000. During 1937, he was general operating superintendent of petitioner and was responsible for the production of logs, the manufacture of lumber and the maintenance of the plant. Petitioner's annual production was between 48 and 60 million feet. He has been engaged in the same kind of work since 1918. Compensation in the amount of $12,000 to William for the services rendered by him to petitioner during 1937 would be reasonable in amount. Petitioner deducted the sum of $28,500 from its gross income in connection with its 1937 corporation income and excess profits tax return. The amount of $8,500 was included in "Compensation of officers," the return reporting the compensation of I. E. Kesterson, W. I. Kesterson, and A. P. Heup as $21,000, $12,000, and $10,000, respectively, that of I. E. Kesterson being listed as "salary"; the *277 balance of $20,000 was included in "Salaries and wages (not deducted elsewhere)." The balance sheet attached, as of December 31, 1937, starts with cash of $47,675.51, shows as "Accounts payable" the sum of $92,696.98, and this sum included the $20,000. No bonus or bonuses in cash, aggregating $28,500, were paid or incurred by petitioner during the taxable year 1937, with the exception of certain small Christmas presents paid on or about December 24, 1937, to various employees, including those who later received the stock. No part of the deficiency determined by the Commissioner in the instant case is due to fraud with intent to evade tax on the part of the petitioner. Opinion DISNEY, Judge: Had the petitioner, which was on the accrual basis, so "paid or incurred" during the taxable year, 1937, expenses of $28,500 to certain officers and employees, as to be entitled to the deduction of that amount as expense of trade or business, under section 23 (a) of the Revenue Act of 1936? [2]
*278 Seeking a deduction, a matter of legislative grace, the petitioner must demonstrate clearly its right thereto, and has the burden of showing error in the determination by the Commissioner denying the deduction on the ground that the amounts "were neither paid or credited nor was any liability for their payment incurred by you during the taxable year 1937." There must be agreement or legal obligation to pay. . The legal obligation, within the taxable year, to pay the amounts involved must be unequivocal. . All events which fix the amount and determine the taxpayer's liability must occur within the year involved. , in which the officers, being half of the directorship, informally determined the amounts and payees of a bonus, and some employees knew of the bonus and amounts, but no entries were made during the year, and it was held that, notwithstanding any promises made, liability did not definitely appear and accrual was denied. . *279 Regulations 94, article 42-2, covering the question, is set forth in the margin. [3]
The evidentiary facts are voluminous, varied and contradictory of each other. They have been set forth in detail in our findings, and will be repeated *280 here only in so far as necessary to examination of the issue presented. The petitioner takes the view that liability for a cash bonus was incurred in 1937, and relies to a large extent upon the discussion which took place at the meeting of December 27, 1937, between the officers and key men. It is true that several of the parties then present took the view in their testimony that they could have received cash, had they wished it. However, the answer lies in the facts, and we must glean the whole record. After doing so, we come to the conclusion that there was no such obligation entered by the petitioner in 1937 as to entitle it to the deduction claimed. When all the facts are considered together, they impel the conclusion that from beginning to end the proposition in the mind of petitioner's officers was not the distribution of cash, but the placing of an interest in the business in the form of stock in the hands of valued key employees in order to insure their cooperation. It is clear that as a stock bonus, there was no right to deduction in 1937, since the payment thereof was altogether contingent upon the ability to issue such stock, which was not authorized or arranged for until *281 1938. The petitioner does not contend that a stock bonus was deductible in 1937, but only that there was incurred obligation to pay cash. It seems unnecessary to examine here in detail the contradictions in the evidence; but we note some of the facts which require our conclusions. We note, first, that the slip of paper given each employee merely contained a figure or amount. It constituted no promise to pay that amount in cash, and we fail to find an oral agreement so promising. Had any of the employees in fact received cash, the result would have been, in our opinion, an unequal treatment as between them and those who later received stock; for the stock later received had to be sold, whenever the employee left the company, or by his estate, in case of his death, at 50 per cent of the purchase price paid. In other words, except for the hope of dividends, such stock was obviously not worth its par value to the holder; moreover, the petitioner, if other stockholders did not buy, had the option of repurchase at the 50 per cent figure. Yet, the petitioner contends that it was willing to pay cash to the extent of full value, that is, that the company had in mind to pay, for instance, *282 to B. G. Thompson either $2,000 in cash, or stock in that amount. We are not convinced that it was during the year 1937 within the mind of either the corporate officers or of the employees that there was such option as between cash or stock. Again, there is no satisfactory explanation as to why the amount of the bonuses did not appear as paid upon the petitioner's return under the Social Security Act. Such an amount representing such a large share of the net income of the petitioner for the year can not reasonably be considered as merely overlooked in the Social Security return. Nor is the fact that some of the employees returned the amount of bonus on their income tax returns indicative that they could have received the cash in 1937. Scrutiny of this situation reveals rather that such returns included the amounts on the advice of the tax counsel of the corporation. He had prior to the filing of the returns of Hamilton, Cater and the two Kestersons either advised them, or had prepared their returns. Purcell and Chase, who did not in their original returns return the amounts of bonus as income received, had not at the time of filing such returns been advised by him. This situation indicates *283 to us nothing to sustain the view that the employees were in 1937 promised cash. The record contains no information as to this situation with ieference to ten other employees who received the bonus in stock. The fact that the employees did later receive checks indicates no earlier right thereto in 1937. Rather, the indication is that there was never any intent to deliver cash; for not only was it the desire of the officers of the company to effect exactly what was in June 1938 effected, that is, the placing of an interest in the company in the hands of key employees through stock holdings, but the checks were, with the exception of that issued to the recalcitrant Heup, immediately endorsed and turned over for the long contemplated stock, and it for a voting trust certificate. Before the checks were ever received, the recipients had definitely decided to take stock, and, in March 1938, entered into the agreement of "Buy and Sell," and the voting trust, on the stock to be received. On the application for a stock selling permit, the petitioner represented $28,500 stock as "subscribed and paid" - long before the checks were issued. This well indicates the formal nature of the checks, *284 and that they signified, not cash to those involved, but stock. The record indicates that in order for the stock to be issued at all, it must be sold to the employees. The permission given by the Corporation Commission of Oregon on May 23, 1938, was to sell stock at $100 per share. We conclude from this record that it was considered necessary to go through a form of sale of stock and that that was a reason for setting up the amounts of bonus to individual accounts payable to the key employees, that is, that by such means the employees could, without expense to themselves, issue the checks necessary to a formal purchase and sale of stock. Indeed, since in the case of the Kesterson brothers and of Heup they had already received credit for the amount of the bonus on accounts receivable from them by the company, it is obvious that the issuance of checks in June 1938 was duplication, so far as the bonus is concerned, indicating either that the crediting of the amount of bonus by way of charge to accounts receivable against them was not intended to be of any final effect, but only to be a step in the process of completion of the arrangement for issuance of stock, or that in addition *285 to giving them credit for the amounts of the bonus, the company also gave them an equal amount of stock. That such double gift was not the intent is indicated by the fact that when Heup, after receiving his check, instead of turning it in for stock, as the others had done, endorsed the check for deposit and cashed it on August 8, 1938. Irving Kesterson "hit the roof." We think therefore that the original book entries are indicated to have been a mere recordation in the process of issuance of stock. It is noteworthy that no checks were issued until long after the agreements of March 22, 1938, as to stock. The record contains no indication that entries were made in such accounts receivable from the Kestersons and Heup, after the issuance of the checks and stock, to offset the credits previously entered, and claimed by the petitioner as a basis for the deductions in 1937. Moreover, the record as to the accounts payable is not such as to invite confidence. The petitioner's Federal income tax return contains a balance sheet as of December 31, 1937; and the application to the State of Oregon for permit to sell the 500 shares of stock also contains a balance sheet as of the same date, December *286 31, 1937. Each starts with cash of $47,675.51, so that there can be no doubt that the two statements purport to represent the financial condition at the same date and covering the same situation. Yet, the balance sheet attached to the return shows accounts payable of $92,696.98, while the balance sheet attached to the application shows accounts payable of $42,029.22. That the latter balance sheet also shows $28,500 as "Unissued stock subscribed and paid" does not explain the discrepancy. Though sheets from the corporation's books show the $20,000 thereon as in accounts payable, the balance sheet attached to the application for permit to sell stock, on the contrary, shows the $20,000 not to be among accounts payable. We conclude that the whole situation as to the accounts receivable, and the later issuance of checks or stock in the same amount and the condition of the balance sheets as to accounts payable constitute other circumstances indicating that the credits are not shown to demonstrate such final and unequivocal authorization of, and obligation in 1937 to pay bonuses in cash, as must be found in order to sustain the petitioner's position. Another circumstance raising a *287 doubt as to whether the company intended during 1937 definitely to become liable for the payment of cash bonuses is the fact that no notice whatever was given to Rodolph, one of those included in the list. Rodolph was surprised to learn about March 1938 that he was included among the bonusees. Had the company intended during 1937 to enter into an obligation to pay a cash bonus, it would reasonably have notified all of the parties involved. This together with the fact that the slips of paper given to all of the other employees (except Ebinger, who did not receive one), contained nothing except a mere statement of amount, is indicative, in our opinion, of a lack of intent to communicate to the parties involved any definite obligation to pay cash. Moreover, the record taken as a whole fails to indicate that the key employees were informed at the meeting about December 27, or otherwise, that the bonuses had been voted. Plainly, some information was given to the employees present, but the record is not convincing that they were informed that there had been voted, and that the company was obligated to pay them, cash bonuses. Rodolph, the tax accountant, was not present at the meeting on *288 December 27, but had gone into the facts of the matter and testifying, thought that only William and Irving Kesterson knew that the bonus had been voted. He testified that when he came to Klamath Falls about March 1938, he learned of the bonus and inquired into it and came to his conclusions as to the deductibility. He was, of course, interested in learning just what had taken place. For this reason we give weight to his testimony that only the Kestersons knew that there had been a vote on the bonus. This is in line with the testimony of the witness Kain to the effect that at a conference regarding the corporation's income taxes for 1937, Irving Kesterson, asked who knew of the bonus on December 31, answered: "My brother and I, Heup and Ebinger." Although upon cross-examination the witness, asked whether the question could not have been asked with reference to what ones of the directors and stockholders knew of the bonus, answered that "It could have been," we do not believe that it was so limited, first, because the testimony was that the discussion had been with reference to bonus to employees as well as directors, and because Ebinger was neither director nor stockholder. The question *289 and answer, therefore, obviously covered others than directors and stockholders. Although several people testified as to the question of bonus and availability in December, examination of the testimony discloses that it is to a considerable extent inconsistent and much of it is not sufficiently definite as to shed real light, upon the question of whether the key employees were actually informed of a cash bonus. Thus Purcell testified that Irving Kesterson had said that they could have cash or stock, but he had written a letter, attached to his amended income tax return, stating that the omitted income was unknown at the time of filing the prior return, and Ebinger testified that he recalled nothing said in so many words about there being a choice. Although Irving Kesterson testified that it was explained to the employees "at our first meeting night" in December that they "had a chance of accepting the bonus in cash, or they could take the same cash and purchase stock," he also says elsewhere, that they had the option of "taking the cash after it was put in the form of a check." It was not put into the form of checks until about June 1938. Again, he says that they were willing to *290 give the boys stock "in lieu of cash." In the protest filed, he recites that the profitsharing plan was formulated during the fall of 1937, and that "the individuals to whom a bonus in the form of stock decided upon, and the amount agreed upon"; though the protest also recites that it would have been agreeable to Kesterson that the compensation be taken in cash and that each was so informed. Taking the testimony as a whole and in connection with the other evidence in the case, we are constrained to believe that there was no choice offered in the December 27, 1937, meeting between stock and cash, but we conclude that, as intended from the beginning and as ultimately carried out, the discussion was of a bonus of stock to be arranged for by the application of the amounts of bonus to be given to the employees; that there was not communicated to the employees in general knowledge that any cash bonus had been voted to them by the stockholders of the corporation; that it was during 1937 not in fact made available to the employees; and that the credits relied upon, entered in 1938, are not shown to indicate obligation in the taxable year. In , *291 there was, much as here appears, determination by the officers of amounts of bonus and of the men involved, and some information to some of the men as to amounts. Book entries were not made until the following year. Closing of books was delayed as here. No accrual was approved. We conclude that deduction of the amount claimed was not proper, either as to officers or employees. Such conclusion is to us the only reasonable reconciliation of all the testimony and evidence. The matter is summed up in Irving E. Kesterson's statement that "The bonus question was a stockholder matter." It was so, we think, because it was a matter of stock. For an additional and separate reason, however, we hold that the petitioner was not so obligated as to be able to take the deductions: the reason being that the directors of the corporation never voted cash bonuses. Though they met on December 21, 1937, and set the salaries to themselves, the meeting on December 24, at which the bonuses here involved were voted upon, was distinctly a stockholders' meeting. The matter here involved is one of compensation to employees. Petitioner's by-laws, article III, under the heading "Powers and Duties of Directors," *292 particularly confer upon the board of directors the power to fix compensation of all officers, agents and employees, as well as power to manage and control and conduct the corporate affairs and business. No such power is given to the stockholders. However, without consideration of the by-laws, it is the general law that the fixing of compensation is a power inherent in the directorship and not in the stockholders. ; (95); . Stockholders have limited powers and do not, except through their directors, have the management of the internal affairs of the corporation. Thompson on Corporations, Second Edition, § 806. See also ; . General review of cases involving this question indicates that the power of compensation is and must be exercised by the directors and not the stockholders. It is true, of course, that the directors might act informally, but *293 at the meeting of December 24 only two of the directors were present. Where the by-laws of the corporation do not specify what constitutes a quorum of directors, Title 25, Ch. 2, § 215 of the Oregon Code of 1930, provides that the power may be exercised by a majority. , holds that in the absence of other provision, resolution by less than a majority of directors was not legally adopted. Title 25, Ch. 2, § 213 of the Oregon Code, further provides that, "From the first meeting of the directors the powers vested in the corporation are exercised by them or by their officers or agents under their direction except as otherwise specifically provided in this chapter." Since there were four directors, it can not be said that the action taken by the two stockholders, at the meeting on December 24, constituted informal action by them as directors, particularly where, as here, one of the directors, Heup, is shown to have opposed granting a bonus. Heup had no notice of a director's *294 meeting, none had been called, and informal action would not have been binding. We consider it clear that the action taken by the stockholders, only two directors being present, on December 24, 1937, was not sufficient to be the basis of such binding obligation on the part of the petitioner to pay a cash bonus, as to authorize accrual and deduction of the amounts involved. In addition, the stockholders did not, in our opinion, pass a resolution to pay a cash bonus, but only to pay a bonus in certain amounts. Though the amounts are designated in dollars, the resolution was immediately followed by one providing for the increase of capital stock because of the desire of the employees to acquire stock, and in order to promote the interest, loyalty and cooperation of the employees. The protest filed by the petitioner recites, as above seen, as to the meeting of December 24, that the "bonus list" was then approved after recitation that during the fall a "bonus in the form of stock" had been decided upon, and that due to other matters final action was delayed until December 24. If a bonus in the form of stock had been decided upon and the matter left to December 24, there is little room for *295 belief that on that date a cash bonus was voted. We think the listing of amounts in dollars does not indicate intent to distribute cash, but only the amount of stock contemplated. We are of the opinion that the meeting of December 24, 1937, did not, even as a stockholders' meeting, resolve to pay a bonus in the form of cash. In the absence of official action, any oral statements made by the Kestersons at the meeting of December 24, would not have bound the corporation. Indeed, the testimony indicates realization by petitioner's officers that the matter for the meeting of December 24 was not one of salaries or compensation, but of stock, necessarily requiring a stockholders' meeting - in addition to the directors' meeting of December 21. "The bonus question was a stockholder matter, and was in a subsequent meeting" is the testimony of Irving E. Kesterson. Had the matter been one of salaries, the directors could have decided it on December 21, just as they did their own salaries proper. Yet, they did not then even raise their own salaries to include the amounts listed to them on December 24. The corporate return includes the $3,000 bonus to Irving E. Kesterson as "salary," showing the *296 essential nature thereof and that it could, had it so been considered a stock bonus matter, having been voted on, on December 21. We conclude and hold that the corporation was not so obligated to pay the cash bonus as to be entitled to the deduction claimed. We consider next the respondent's contention that a part of the deficiency determined was due to fraud with intent to evade tax, calling for the addition of 50 per cent to the deficiency under section 293 of the Revenue Act of 1936. [4] In this respect of course, the burden is upon the respondent. Here again there is much conflict of evidence. It is not necessary, we think, to discuss at length the various elements thereof. Upon review of the whole situation, we can not say, the burden lying where it does, that we are convinced that fraud has been demonstrated so clearly and convincingly as is required for the addition of the 50 per cent. Although we have concluded that the petitioner has not sustained its burden of showing that it had incurred a deductible obligation in 1937 in the form of a liability to pay a cash bonus, and although records were made and credits entered, which the respondent contends could not have been done *297 is good faith, we do not think the respondent has met his burden in this respect. The petitioner relied largely upon the advice of the tax accountant, Rodolph. He testified that the basis for his view, that the deduction was properly allowable for 1937, was that "The bonus had been decided on before the end of the year" and "that was good enough for me." He repeats again that his consideration was whether or not "the action had been decided upon and definitely determined before the end of the year." This being the attitude of the petitioner's tax consultant, we are not prepared to say that the petitioner's officers did not believe that a mere determination upon a bonus before the end of the year was sufficient basis upon which to take the deduction. It is true that in the trial of this case a determined effort was made to show an obligation to pay a cash bonus, which effort, in our opinion, failed. Nevertheless, we can not say, upon the evidence before us, that the petitioner's return is shown to have been made fraudulently. *298 Upon the whole record, we hold that the respondent erred in adding 50 per cent of the total amount of the deficiency on the theory of fraud with intent to evade tax. In the light of the above conclusions, consideration of other issues is not necessary. Decision will be entered under Rule 50. Footnotes
1. 2. During the summer of 1937, Irving E. Kesterson and W. I. Kesterson, brothers and managing officers of the taxpayer, discussed the proposition of granting certain employees and associates of the taxpayer an interest in the business in order to compensate for services being rendered to the company. This was discussed and agreed upon in principal before November of 1937. * * * * *
4. The profit sharing plan of the Kesterson brothers was formulated during the fall of 1937, the individuals to whom a bonus in the form of stock decided upon, and the amount agreed upon. Due to the pressing nature of other corporate matters, the final action of the bonus matter was not formally voted upon until December 24, 1937, at which time a meeting was held and the bonus list approved. 5. The secretary of the corporation was not present at the meeting due to the fact that he had been assigned duties of attending to the distribution of the taxpayer's products in California. Proposed minutes of the meeting had been previously prepared, and were changed to conform to the facts and presented to the secretary for formal recording by him at a later date. 6. At the time of voting the compensation at the second special meeting of the stockholders held on December 24, 1937, the amount of such compensation was definitely fixed in amount. It would have been agreeable to the Kesterson brothers that each individual take his compensation in cash and each was so informed. It was also intended to give each of the persons named in such resolution an option to purchase common stock of the company in the amount of his bonus, which stock had a value in excess of its sale value to such persons. The details of such purchase were not worked out until 1938.↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *↩
3. Art. 42-2. Income not reduced to possession. - Income which is credited to the amount of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition. A book entry, if made, should indicate an absolute transfer from one account to another. If a corporation contingently credits its employees with bonus stock, but the stock is not available to such employees until some future date, the mere crediting on the books of the corporation does not constitute receipt.↩
4. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3176 of the Revised Statutes, as amended.↩